DEZIEL v DIFCO LABORATORIES, INC (AFTER REMAND)

BAHU v CHRYSLER CORPORATION

MacKENZIE v FISHER BODY DIVISION, GENERAL MOTORS
CORPORATION

Docket Nos. 54825, 54879, 55072. Argued June 4, 1974 (Calendar Nos.
1-3).—Decided August 19, 1975. 394 Mich 466. Argued on
resubmission after remand March 2, 1977 (Calendar Nos. 9-11).
—Decided July 17, 1978. Rehearing denied as to *Deziel* and
*MacKenzie post,* p 955.

These cases concern the compensability of psychiatric injuries
under the Worker's Disability Compensation Act. In each case,
there was no dispute that the claimant suffered a work-related
personal injury and that the claimant was disabled, and no
dispute that the claimant honestly, though perhaps mistakenly,
perceived that the disability was caused by the personal injury.
The Supreme Court remanded the cases to the Workmen's
Compensation Appeal Board for clarification of the decision of
each case and retained jurisdiction. After clarification the
Supreme Court ordered the appeals resubmitted.

Mary Deziel claimed workmen's compensation against her em-
ployer, Difco Laboratories, Inc., asserting she cannot work
because of pain in the back of her eyes, anxiety, headaches,
tiredness, and occasional dizziness, nausea and tightness in the
chest. No physical cause for these symptoms has been found.
The referee awarded compensation, finding that an accident at
work aggravated a pre-existing latent mental disorder culmi-
nating in total occupational disablement. The appeal board
reversed the referee. The Court of Appeals, Bronson, P.J., and

REFERENCES FOR POINTS IN HEADNOTES

[1, 3, 10] 82 Am Jur 2d, Workmen's Compensation §§ 240 *et. seq.,* 301,
302.
[2, 16] 82 Am Jur 2d, Workmen's Compensation §§ 301, 302, 333, 337,
507, 516.
[4–8, 14, 15] 82 Am Jur 2d, Workmen's Compensation § 301.
[9] 81 Am Jur 2d, Workmen's Compensation § 29.
    82 Am Jur 2d, Workmen's Compensation § 296.
[11, 12] 82 Am Jur 2d, Workmen's Compensation §§ 547, 635.
[13] 82 Am Jur 2d, Workmen's Compensation §§ 568, 616, 642.

Quinn and Danhof, JJ., denied leave to appeal (Docket No. 16185). Plaintiff appealed. On remand the appeal board held that it had not been shown that plaintiff Deziel's disability had been aggravated by her work.

Yusuf Bahu claimed workmen's compensation against his employer, Chrysler Corporation, alleging inability to work because of pain in his back, neck and arm. At the hearing, plaintiff's psychiatrist said that Bahu's physical pain was caused by pre-existing personality factors and the precipitating events of a stressful job situation at Chrysler. Defendant's psychiatrist said the pain was not caused by or aggravated by his work at Chrysler, but rather that Bahu's personality makeup was fragile when he came to Chrysler and he subconsciously attached his life's troubles to the event of the work-related injury. The referee awarded compensation. The appeal board reversed. The Court of Appeals, J. H. Gillis, P.J., and Bashara and O'Hara, JJ., denied leave to appeal (Docket No. 16600). Plaintiff appealed. On remand the appeal board adopted its former dissenting opinion finding that the injury was job-related because the job provided the plaintiff the "hook" on which he could hang his troubles and awarded benefits to the plaintiff.

Howard K. MacKenzie claimed workmen's compensation against his employer, General Motors Corporation, Fisher Body Division. Plaintiff's psychiatrist testified that MacKenzie suffered from a long-standing personality defect of compulsive perfectionism that centered on his job, and that eventually the job pressures disabled him. Defendant's psychiatrist testified that it was MacKenzie's perfectionistic need in conflict with the impairments of aging that produced his anxiety and that although MacKenzie perceived the stresses of the job as causing his anxiety those stresses were usual occurrences and did not cause his emotional problems. The referee awarded compensation finding that, although the stresses of the job were not great enough to cause ill effects in an average person, the stress did cause MacKenzie to become disabled. The appeal board reversed. The Court of Appeals, R. B. Burns and Van Valkenburg, JJ., affirmed (Bronson, P.J., dissenting) (Docket No. 14695.) 48 Mich App 175; 210 NW2d 357 (1973). Plaintiff appealed. On remand the appeal board adhered to its previous position: it found that MacKenzie's illness arose from an imagined or hallucinated stimulus that had not been proven to exist except in his own mind. It found he had a predisposition to the mental condition and internal stimulus that eventually caused his disablement. *Held:*

1. An injury, whether physical or mental, must arise out of

and in the course of employment to be compensable under the Worker's Disability Compensation Act. The question of fact is whether the claimant's employment aggravated, accelerated or combined with some internal weakness or disease to produce the physical or mental personal injury which disabled him.

2. Workmen's compensation law permits compensation for disabilities and injuries rooted in psychoses which are "causally" established as arising "out of and in the course of" the employment relationship. These cases involving mental conditions have generally been divided into three groups: a mental stimulus which has a physically disabling effect, a physical trauma or stimulus which results in a mental condition, and a mental stimulus which results in a mental condition. Although other jurisdictions are split on the compensability of the third type of case, in Michigan workmen's compensation may be awarded for any of the three types of cases.

3. In the instant cases it is clear, after remand, that the three plaintiffs are "disabled" within the meaning of the statute and that they are disabled on account of some "personal injury". The questions are whether the Workmen's Compensation Appeal Board used the correct standard in determining whether the plaintiffs' employment aggravated, accelerated, or combined with some internal weakness or disease to produce the disability, and whether the appeal board correctly applied the standard.

4. In cases involving mental (including psychoneurotic or psychotic) injuries, once a plaintiff is found disabled and a personal injury is established, it is sufficient that a strictly *subjective* causal nexus be factually established, *i.e.,* that the claimant honestly perceives some personal injury incurred during the ordinary work of his employment "caused" his disability. This standard applies where the claimant alleges a disability resulting from either a physical or mental stimulus and honestly, even though mistakenly, believes that he is disabled due to that work-related injury and therefore cannot resume his normal employment.

5. Any objective standard would not suffice; the inherent nature of psychoneuroses and psychoses is subjective, case law impliedly requires a subjective standard, and statutory construction requires that remedial legislation, such as workmen's compensation acts, be construed liberally. The Workmen's Compensation Appeal Board and its referees have the ability to detect malingerers at the fact-finding level. In fact, conscious simulation of a mental disorder by a claimant may be easier for the finder of fact to detect than certain feigned physical inju-

ries such as "whiplash" or back injury. Detection of falsified mental disability claims may be difficult if the testimony of expert witnesses is biased or perjured, but this difficulty may also exist in physical disability claims.

6. Almost all psychoneuroses and psychoses are, to some degree, latent in origin. The claimant's predisposition to such disabilities usually can be traced to childhood. Therefore, a "but-for" or other objective proximate causation test would not be helpful in determining whether the claimant's employment combined with some internal weakness or disease to produce the disability. In most cases multiple psychodynamic factors are involved; therefore, it is almost impossible to weigh the causal significance of any one factor. These mental conditions take on so many shades and forms that there is no logical pattern conforming to any objective test of legal causation.

7. These mental illnesses constitute, by definition, subjective injuries and disabilities. That is, they may only exist within the minds of the victims, as disorders which are rooted in unconscious mental causes. The victim's disturbed perception of reality is not, however, imaginary to him. Therefore in most cases the question of whether there is an objective causation is unanswerable.

8. The primary goal of workmen's compensation is to compensate a worker for his disability loss. When there is doubt as to the standard of causation which might lead a court to deny recovery under tort law, the notion of causation should be interpreted progressively or liberally. The Workmen's Compensation Appeal Board and its referees, with the assistance of expert witnesses, will continue to be charged with the fact-finding function of detecting any falsified claims.

9. It is clear to the Court that in *Deziel* and *MacKenzie*, if the board had used the subjective standard it would have awarded the plaintiffs compensation. In these cases, there is no competent evidence to support the finding of the Workmen's Compensation Appeal Board that the plaintiff's employment did not aggravate, accelerate or combine with some internal weakness or disease to produce the disability. The undisputed evidence, testimony by the expert witnesses for each of the parties, was that the plaintiffs honestly perceived their work-related personal injuries to be the cause of the disability. The Workmen's Compensation Appeal Board cannot draw inferences contrary to the undisputed evidence.

10. In *Bahu* the Workmen's Compensation Appeal Board correctly used the subjective standard in establishing the causal nexus. The expert witnesses for both parties agreed that

the plaintiff actually believed that his disability was caused by the work-related personal injury.

The order of the Workmen's Compensation Appeal Board on remand is affirmed as to plaintiff Bahu, and the orders are vacated and the cases remanded for further proceedings as to plaintiffs Deziel and MacKenzie.

Justice Coleman, joined by Justices Fitzgerald and Ryan, dissented on the ground that application of the Court's "honest perception" test for causal nexus in cases where the disability and personal injury are established would result in an award of compensation for virtually all, if not all, claims based on mental disorders. If the claimant perceived that the job caused the problem, even if this were not true, the employer would be liable. The new formulation ignores both the fundamental nature of these mental disorders and the statutory requirement that causal nexus be *factually* established. The opinion of the Court also takes away the fact-finding role of the Workmen's Compensation Appeal Board and substitutes the Court's findings of fact prior to a second remand of these cases. A valid analysis of the causal nexus between mental disability and occupational trauma requires a basic understanding that most psychotic and neurotic states do not have a single cause in fact, but are emotional disorders with a pre-existing, extremely complex, etiology originating in childhood. Symptoms are usually preceded by some form of trauma, however minor; but the relationship between the trauma and symptoms is more chronological than causal. The claimant who suffers from a neurotic state is aware, on either a conscious or a subconscious level, of the inner conflicts and emotional weaknesses; but he is unable or unwilling to recognize and resolve these problems. The disorder is an unconscious attempt at resolution. The claimant may be consciously aware of only the work-related trauma, no matter how trivial, as the cause of his disorder and may incur a "secondary gain" by attributing causation to employment (*e.g.,* a person who dislikes the work or who, because of the aging process, is no longer psychologically able to do it is given the opportunity to cease working, end fiscal responsibility, obtain financial compensation and create a socially acceptable excuse for not working). A neurotic personality, not recognizing reality, is *predisposed* to "honestly perceive" a causal connection between a work-related injury and the disability. Adoption of this test only invites confusion, difficulty for the finder of fact and increased arbitrariness in workmen's compensation cases. The relevant inquiry should be whether the claimant's employment did, in fact, aggravate, accelerate, or combine with

some internal weakness or disease in some substantial degree to produce the disability. The Court should not disturb the findings of fact made by the Workmen's Compensation Appeal Board upon directions from the Court on remand.

OPINION OF THE COURT

1. WORKMEN'S COMPENSATION—WORK-RELATED INJURY.

Any injury, whether physical or mental, to be compensable under the Worker's Disability Compensation Act, must arise out of and in the course of employment (MCL 418.301; MSA 17.237[301]).

2. WORKMEN'S COMPENSATION—WORK-RELATED INJURY—MENTAL DISORDER—PRE-EXISTING CONDITION.

A worker is entitled to workmen's compensation benefits for a mental disorder or injury which disables him where his employment aggravated, accelerated or combined with some pre-existing internal weakness or disease to produce the injury which disabled him (MCL 418.301; MSA 17.237[301]).

3. WORKMEN'S COMPENSATION—WORK-RELATED INJURY—MENTAL DISORDER.

The Worker's Disability Compensation Act permits compensation for physical or mental disabilities and injuries rooted in psychoses which are causally established as arising out of and in the course of the employment relationship (MCL 418.301; MSA 17.237[301]).

4. WORKMEN'S COMPENSATION—WORK-RELATED INJURY—MENTAL DISORDER—SUBJECTIVE TEST.

A worker is entitled to workmen's compensation benefits for a mental disorder where he is found to be disabled, the occurrence of a personal injury is established, and it is factually established, by a strictly subjective causal nexus, that the worker honestly, though perhaps mistakenly, perceives that a physical or mental personal injury incurred during the ordinary work of his employment caused his disability and that he therefore cannot resume his normal employment, (MCL 418.301; MSA 17.237[301]).

5. WORKMEN'S COMPENSATION—WORK-RELATED INJURY—MENTAL DISORDER—SUBJECTIVE TEST.

Any objective causal standard for determining whether a worker's mental disorder is work-related would not suffice for workmen's compensation claims which allege psychoneurotic or psychotic disabilities and injuries because almost all psychoneu-

roses and psychoses are, to some degree, latent in origin and a claimant's predisposition to such disabilities usually can be traced to childhood; these mental disorders take so many forms that they show no logical pattern vis-a-vis any objective test of legal causation (MCL 418.301; MSA 17.237[301]).

6. WORKMEN'S COMPENSATION—PSYCHOSES—PSYCHONEUROSES—WORDS AND PHRASES—MENTAL HEALTH.

Psychoses and psychoneuroses are mental disorders which are rooted in unconscious mental causes; persons suffering from these disorders develop personality problems which make it difficult for them to adapt to reality either because perception of reality is distorted or, in the worst psychotic cases, lost.

7. WORKMEN'S COMPENSATION—WORK-RELATED INJURY—MENTAL DISORDER—SUBJECTIVE TEST.

The disturbance which a psychoneurotic or psychotic workmen's compensation claimant experiences is not imaginary *to him,* although his perception of reality may be unrealistic or mistaken; the subsequent incapacity is as real to the claimant as that resulting from a clearly discernible physical disability and must be examined under a strictly subjective standard in determining whether the claimant's employment combined with some internal weakness or disease to produce the disability.

8. WORKMEN'S COMPENSATION—WORK-RELATED INJURY—MENTAL DISORDER—SUBJECTIVE TEST—CASE LAW.

Michigan case law impliedly requires the use of a subjective standard in determining workmen's compensation claims arising out of mental injuries resulting from nervous or mental stimuli.

9. WORKMEN'S COMPENSATION—STATUTORY CONSTRUCTION.

Remedial legislation, such as the Worker's Disability Compensation Act, should be construed liberally (MCL 418.101 *et seq.;* MSA 17.237[101] *et seq.).*

10. WORKMEN'S COMPENSATION—WORK-RELATED INJURY—CAUSATION —TORTS.

The primary goal of workmen's compensation legislation is to compensate a worker for his disability loss; therefore, only a very general theory of causation, that the injury and disability must arise "out of and in the course of" employment, applies to such claims and workmen's compensation is often awarded on facts which might lead a court to deny recovery under tort law (MCL 418.301; MSA 17.237[301]).

11. WORKMEN'S COMPENSATION—MENTAL DISORDER—FALSIFIED CLAIMS —QUESTION OF FACT.

Conscious simulation of a mental disorder by a workmen's compensation claimant may be easier for the finder of fact to detect than certain feigned physical injuries such as "whiplash" or back injury.

12. WORKMEN'S COMPENSATION—MENTAL DISORDER—FALSIFIED CLAIMS —QUESTION OF FACT.

The detection of falsified workmen's compensation claims for a mental disorder is a question of fact which must be left to the Workmen's Compensation Appeal Board and its referees, with the assistance of expert witnesses.

13. WORKMEN'S COMPENSATION—APPEAL AND ERROR—FINDING OF FACT.

An order of the Workmen's Compensation Appeal Board is reversed where there is no competent evidence to support the appeal board's finding of fact; the appeal board cannot draw inferences contrary to the undisputed evidence (Const 1963, art 6, § 28).

DISSENTING OPINION BY COLEMAN, J.

FITZGERALD AND RYAN, JJ.

14. WORKMEN'S COMPENSATION—PSYCHOSES—NEUROSES—WORDS AND PHRASES—MENTAL HEALTH.

*Most neurotic and psychotic states do not have a single cause-in-fact; they are emotional disorders with a complex etiology originating in childhood and although symptoms are usually preceded by some form of trauma, reality is not recognized and the relationship between the trauma and symptoms is more chronological than causal.*

15. WORKMEN'S COMPENSATION—WORK-RELATED INJURY—MENTAL DISORDER—SUBJECTIVE TEST.

*Adoption of a "honest perception" of the claimant standard for determining whether a mental disorder is, in fact, work-related only invites confusion, difficulty for the finder of fact and increased arbitrariness when determining employers' responsibility for workmen's compensation benefits (MCL 418.301; MSA 17.237[301]).*

16. WORKMEN'S COMPENSATION—WORK-RELATED INJURY—MENTAL DISORDER—CAUSAL CONNECTION.

*The inquiry in a claim for workmen's compensation benefits for a*

*mental disorder should be whether the claimant's employment
did, in fact, aggravate, accelerate or combine with some inter-
nal weakness or disease in some substantial degree to produce
the disability (MCL 418.301; MSA 17.237[301]).*

*Kelman, Loria, Downing, Schneider & Simpson*
for plaintiffs Deziel and Bahu.

*Levine & Benjamin, P.C.,* for plaintiff Mac-
Kenzie.

*LeVasseur, Werner, Mitseff & Brown* (by *Gra-
hame G. Capp)* for defendants Difco Laboratories,
Inc., and Michigan Mutual Liability Company.

*Lacey & Jones* (by *Francis L. Sylvester)* for
defendant Chrysler Corporation.

*Plunkett, Cooney, Rutt, Watters, Stanczyk &
Pedersen* (by *Edward K. Pedersen* and *Jeannette
A. Paskin; Frazer F. Hilder,* General Counsel, and
*Thomas W. Watkins* and *James A. Durkin,* of
counsel) for defendant General Motors Corpora-
tion.

AFTER REMAND

BLAIR MOODY, JR., J. We originally granted
leave in these three cases and directed that they
be argued and submitted consecutively because
they all concern aspects of the same problem:
when and under what conditions alleged mental
disorders[1] (including psychoneuroses and psy-
choses) are compensable under the Worker's Dis-
ability Compensation Act of 1969 (the Act). 394
Mich 466; 232 NW2d 146 (1975).

However, after hearing extensive oral argu-

---

[1] It must be understood at the outset that the use of such descrip-
tive terms as mental, nervous, psychoneurotic, psychotic, is not in-
tended to convey precise medical meanings. Rather, they are em-
ployed to differentiate an almost infinite number of subtle psychologi-
cal conditions and relationships for compensation law purposes.

ments, examining the briefs and reviewing the record, and upon reading the opinions of both the referees and Workers' Compensation Appeal Board (the WCAB), this Court determined that in each case certain vital factual findings had been omitted by the WCAB. Therefore, we had no choice but to remand each case to the WCAB for amplification of its factual findings (retaining jurisdiction).

Upon remand, we informed the WCAB that we were not convinced that it had properly construed the law as it applies to mental disabilities of the character involved in these cases. The Court stated that for *any* injury to be compensable it must arise "out of and in the course of" employment. MCLA 418.301; MSA 17.237(301). In cases such as these, which involve an alleged pre-existing mental condition, the question of whether a disability arose out of the employment should be resolved by establishing a work nexus.

Furthermore, the legal principle to be applied by the WCAB is set forth in Larson's treatise on Workmen's Compensation Law, § 12.20, p 3-231, whether

"the employment aggravated, accelerated, or combined with the disease or infirmity to produce the * * * disability".

This Court then gave the WCAB a three-step test to apply in resolving the questions of fact and law relating to compensability in these cases:

"1) Is the claimant disabled?

"2) If so, is the claimant disabled on account of some 'personal injury'?

"3) Did the claimant's employment aggravate, accelerate, or combine with some internal weakness or disease to produce the personal injury?

"If those questions are answered in the affirmative and supported by the record, the decision maker must then find as a matter of law that the claimant had a personal injury, which arose out of the employment, and that compensation must be awarded.

"By the same token, if there is support for a negative answer to any of the questions, compensation may not be awarded." 394 Mich 476.

The WCAB has amplified the records and now these cases are once again before our Court. However, before we discuss the WCAB's decisions on remand, we will briefly restate:

1) the facts in each case;

2) the initial decisions of the referee, WCAB and Court of Appeals in each case;

3) this Court's specific remand order as it applied to each case; and

4) the pertinent part of the WCAB's majority opinion in each case upon remand.

## DEZIEL

### 1. The Facts

"Mary Deziel, 39 at the time of suit, began working for Difco in 1968 handling test tubes, mixtures and various chemicals. On January 23, 1969 a test tube she was filling broke, causing glass to get into her eye. She was treated the next day and returned to work. On April 24, 1969 a test tube filled with iodine slipped from her hand and hit the table, splattering iodine around her eyes. She has not returned to work since. She made claim for compensation asserting she cannot work because of pain in the back of her eyes, anxiety, headaches, tiredness, and occasional dizziness, nausea and tightness in the chest. No physical cause for these symptoms has been found.

"In her testimony before the referee Deziel denied being treated for headaches and nervousness prior to working for Difco.

"However, prior to her employment with Difco, Deziel lived and worked in Ontario where she was treated by Dr. Brewer, who was deposed by Difco after the referee's decision. Brewer testified that he had treated Deziel for various ailments including headaches, anxiety, and tiredness but did not recall whether she had complained of eye problems." 394 Mich 470-471.

### 2. Initial Decisions

"The referee accepted and adopted the disease theory of Difco's psychiatrist, Dr. Forrer, namely that Deziel has always suffered from an obsessive-compulsive character which attached to the eye injury and developed into a psychosis, called a schizophrenic reaction. Coupled with that disease theory, the referee found that the iodine splashing 'aggravated the pre-existing latent mental disorder' culminating into a total occupational disablement. He awarded compensation.

"The Appeal Board in a unanimous opinion reversed the referee, holding that Deziel had not met the burden of proof to show her ailments were associated with her work, because with the exception of her eye ailments she had suffered the same symptoms since 1962." 394 Mich 471.

(The Court of Appeals denied leave to appeal.)

### 3. Remand Order

"In *Deziel,* the Appeal Board explained its holding in this manner:

" 'Mainly by her own testimony did the plaintiff prevail before the referee, proving a psychiatric disability associated with her work. Since the decision, additional testimony in the nature of a deposition by Dr. Brewer has become a part of the record. This deposition shows, with substantial weight, that plaintiff had been suffering from the same symptoms since 1962 and periodically thereafter which is most impressive to the point that her disability was not causally connected with her work. Further, her credibility is impaired by the fact she denied suffering such disability prior to her

employment with the defendant which is completely
controverted by the doctor's deposition.

" '(11) The only discrepancy between her symptoms of
1962 and thereafter and her allegations of disability
upon which she predicates her petition for benefits is
pain behind the left eye. The plaintiff has not met the
burden of proof to show her ailments are associated
with her work or that her injury precipitated her
present, allegedly disabled condition.

" 'The order of the referee is reversed.'

"From our reading of this, it is impossible for us to
determine whether they addressed themselves to the
appropriate question. If they did not, their holding as a
matter of law would be erroneous.

"We remand for clarification, retaining jurisdiction.

"The phrase 'allegedly disabled condition' in the last
full paragraph quoted indicates that the board may
have concluded that the claimant was not disabled
despite the testimony of both psychiatrists which seem
to lead to the conclusion that she is disabled. The first
paragraph, however, indicates that the board accepted
the evidence of disability, but concluded the disability
was not occasioned by her work.

"The applicable law is clear. If the claimant is dis-
abled on account of her employment aggravating, accel-
erating or combining with some internal weakness or
disease she is entitled to compensation.

"There is no need to seek any further connection
between the work and disability." 394 Mich 476-477.

## 4. WCAB's Majority Opinion Upon Remand

"Plaintiff's testimony under oath is completely rebut-
ted as to previous ailments by Dr. Brewer, a medical
witness who treated her prior to her employment with
the defendant and was called by the defendant for the
purpose of impeachment. We have a situation where
this Board has the prerogative of disregarding plaintiff's
complete testimony unless her testimony is corrobo-
rated by other evidence.

"This not being the case we find that plaintiff has not
met the burden of proof to show her employment

aggravated, accelerated, or combined with some internal weakness to produce an injury.

"Plaintiff's medical problems of 1962 coincide with those now alleged to be disabling by the plaintiff. This fact negates a finding that plaintiff's disability is company-oriented in any way.

"The record calls for a finding of disability and personal injury. As to employment aggravating, accelerating or combining with some internal weakness or disease to produce the personal injury we find in the negative. Other than the fact plaintiff has not worked since the second test tube dropping incident we can find little evidence to promote the plaintiff's case, especially in the light of the obvious credibility gap." Opinion on remand, pp 2-3.[2]

## BAHU

### 1. The Facts

"Bahu, 35 at the time of suit, was hired by Chrysler in 1967. In 1968 he worked at a stamping machine lifting and moving 1500 seven-pound parts a day from an overhead conveyor to large tubs. From September

---

[2] The minority opinion upon remand would have found for compensation:

"Plaintiff's work history of several years stands unrebutted in the record before us. It was stipulated that this employee suffered injury on April 24, 1969, while employed by defendant. The testimony of both plaintiff and defendant's medical authorities who had examined plaintiff since the injury occurred establishes beyond doubt that this employee is truly disabled. Even if we assume that plaintiff was aware of the nature of her illness in 1962, and had deliberately lied about same, the fact remains that she had performed work satisfactorily for many years in the interim and has been unable to do so since the injury here involved occurred. Compensation is paid upon a showing of an injury and resulting disablement. There is no prohibition within the statute against the grant of an award for ensuing disablement even though the claimant may have testified untruthfully about other matters.

"My associates' holding that the credibility of this employee's testimony refutes all the proofs of disablement which has continued since the date of injury in April, 1969, and defeats her claim, is nothing more than an erroneous factual crutch created to defeat her claim and avoid an award for the injury received. The referee's order being in compliance with the proofs before us should here be affirmed," Opinion on remand, p 10.

19, 1968 through October 7, 1968 he was off work with back pains and was voluntarily paid workmen's compensation benefits. Bahu returned to work and continued to complain of pain in his back, neck, and arms and of an inability to move one of his arms. He asked for lighter work but was refused. He quit on January 4, 1969. From January 29, 1969 through part of 1970 he worked at other jobs, but quit because of pain in his back and neck and arm.

"At the hearing before the referee on his claim for compensation, two psychiatrists testified. Plaintiff's psychiatrist, Dr. Dorsey, said that Bahu's physical pain was caused by pre-existing personality factors plus the precipitating events of a stressful job situation at Chrysler.

"Defendant's psychiatrist, Dr. Forrer, testified that Bahu was in pain. Forrer said that the pain was not caused by or aggravated by his work at Chrysler, but rather that Bahu's personality makeup was fragile when he came to Chrysler and he subconsciously attached his life's troubles to the event of the work-related injury. In the words of Dr. Forrer the work injury was 'a convenient hook on which he can attach causation for troubles of all kinds'." 394 Mich 472.

## 2. Initial Decisions

"The referee, without stating any reasons, found that Bahu received a compensable personal injury, and awarded compensation from January 5, 1969 until further order.

"The Appeal Board in a four to three opinion was not persuaded that Bahu's disability was causally related to his work for Chrysler. The dissenting members would have awarded compensation, finding that the requirement of job relationship was satisfied because the job provided the hook on which Bahu could hang his troubles." 394 Mich 472-473.

(The Court of Appeals denied leave to appeal.)

## 3. Remand Order

"In *Bahu* we have the same problem as *Deziel.* The board concluded that it was not persuaded 'that plain-

tiff has a disability causally related to his work for the defendant'.

"We are unable to discern from the board's opinion whether they found that *Bahu* was in fact disabled.

"We remand for the same fact finding ordered in *Deziel* and point out that a disabled plaintiff who has suffered a personal injury is not required to prove a 'causal' relationship between his injury and his work. A sufficient connection between the injury and the employment is established if the employment aggravated or accelerated or combined with some internal weakness to produce the injury." 394 Mich 477-478.

## 4. WCAB's Majority Opinion Upon Remand

(The WCAB in a unanimous[3] decision upon remand reversed its previous decision and awarded compensation to Bahu. The board's analysis is excerpted in pertinent part.)

" 'In summary, plaintiff may have been an emotional "accident waiting to happen," but the accident did happen (injury stipulated) and per his unimpeached testimony the residuals thereof have continued and have disabled him. That is all the plaintiff knows or all he is capable of having insight regarding. The expert witnesses tell us there is no physical disability remaining except that in plaintiff's mind a real disability [remains]. This is a psychiatric disability "precipitated" by a sequence of events including the work injury (per Dr. Dorsey), which injury was a "hook on which he can attach causation" (per Dr. Forrer).

" 'This writer submits the referee's awarding of partial compensation during the brief periods of subsequent employment, and an open award of weekly benefits [have] record support. There are not proofs to justify reversal.'

[3] The WCAB reversed its previous decision unanimously; member Storie concurred to the extent that the opinion reaffirmed his previous dissenting opinion.

"This fact-finding, I believe, answers *affirmatively* all of the Court's test questions:

" '1) Is the claimant disabled?

" '2) If so, is the claimant disabled on account of some "personal injury"?

" '3) Did the claimant's employment aggravate, accelerate, or combine with some internal weakness or disease to produce the personal injury?' " Opinion on remand, p 3.

## MACKENZIE

### 1. The Facts

"MacKenzie, 65 at the time of suit, began working for General Motors in 1924 at the age of 15. In 1965 he took an early retirement at age 56. For about five years prior to his retirement he worked on the day shift in a General Motors Fisher Body salvage department. His job was to count, keep track of, and ship back to vendors red-tagged defective parts. During his last two or three years with General Motors he became irritable and nervous because the afternoon shift would take defective parts from his department and install them on cars in the assembly line. This caused him to worry about the safety of new cars and required him to recount the remaining parts and account to his supervisors for the missing parts. In addition, the poor work habits of his co-worker required MacKenzie to work harder, which added to his anxiety.

"He made claim for compensation. At the hearing before the referee, MacKenzie's psychiatrist, Dr. Dreyer, testified that MacKenzie suffered from a long-standing personality defect of compulsive perfectionism that centered on his job, and that eventually the job pressures disabled him. This was subjective analysis based on MacKenzie's view of his job.

"General Motor's psychiatrist, Dr. Fink, testified that it was MacKenzie's perfectionistic need in conflict with the impairments of aging that produced his anxiety and that although MacKenzie perceived the stresses of the job as causing his anxiety those stresses were usual occurrences and did not cause his emotional problems.

This was an objective analysis based on the normal worker's view of MacKenzie's job." 394 Mich 473-474.

## 2. Initial decisions

"The referee awarded compensation finding that, although the stresses of the job were not great enough to cause ill effects in an average person, the stress did cause MacKenzie to become disabled.

"The Appeal Board in its five to two majority opinion reversed the referee and rejected the subjective analysis in favor of an objective analysis and ruled that an actual mental injury caused by a claimant's perception of his work environment is not compensable when that environment is not injurious to the average worker.

"Two members of the board dissented and would have awarded compensation by applying the subjective analysis and finding that the on-the-job stress aggravated MacKenzie's pre-existing personality disorder.

"The Court of Appeals majority did not speak to whether a subjective or objective test should be used. It affirmed, holding only that there was evidence to support the board's findings of fact.

"Judge BRONSON dissented, stating that *Carter v General Motors Corp,* 361 Mich 577; 106 NW2d 105 (1960), requires that a subjective analysis must be employed in deciding the issue of causation. [48 Mich App 175; 210 NW2d 357 (1973).]" 394 Mich 474.

## 3. Remand Order

"In *MacKenzie* the board's majority impliedly found that plaintiff was disabled by a mental condition that amounted to a personal injury.

"It is not clear why the majority denied compensation. They may have found that the claimant's disability had no connection with his work. The majority said:

" 'In this case, plaintiff MacKenzie was disabled by something from within—that internal cause of his disability being a personality disorder dating back to his youth.'

"On the other hand they may have denied compensation because they believed that a work-related personal mental injury in order to be compensable must result

from an actual stressful situation. In their next sentence the majority stated:

" 'We know of no case law that would permit compensation for plaintiff's *perception* of a work environment as injurious, when in fact that perception does not square with fact and the environment is shown not to be injurious.' (Emphasis in the original.)

"Such an objective standard (*i.e.*, the effect of the actual work environment on the average worker) is not the standard to be employed. In workmen's compensation psychiatric disability cases a subjective standard (*i.e.*, the effect of the perceived work environment on the claimant) is used when determining whether the injury arose out of the employment.

"In *Carter v General Motors,* 361 Mich 577; 106 NW2d 105 (1960), this Court affirmed an award of compensation to an employee whose disability resulted from his pre-existing mental disturbance and ordinary assembly line pressures.

"The Court in *Carter* applied a subjective test, saying at 585:

" ' * * * his disability was caused by emotional pressures produced by production line employment not shown by him to be unusual in any respect,—that is, not shown by him to be any different from the emotional pressures encountered by his fellow workers in similar employment.'

"The instant case is on all fours with *Carter.* The fact that MacKenzie's mental condition became acute because of the abnormal perception of his employment does not make the connection with that employment any less real for MacKenzie.

"We remand in this case for clarification. Did MacKenzie's employment aggravate, accelerate, or combine with his personality disorder to produce his injury or was his injury totally unrelated to his employment?" 394 Mich 478-479.

## 4. WCAB's Majority Opinion Upon Remand

"The first two of the three questions—whether plaintiff has disability and personal injury we again answer in the affirmative (See 1972 WCABO [1370]). To the

third—aggravation, acceleration or combination—we again answer in the negative and deny compensation.

\* \* \*

"Again in retrospect, perhaps the choice of the word 'perception' should have yielded to a more descriptive term—hallucination. We attempted then, and now, to accept the proposition that the most ordinary stimulus can be devastating and thus compensable when it causes disability in a predisposed individual. But we attempted then, and now, to exclude situations where the claimed compensable disability arose from an imagined/perceived/hallucinated stimulus *that has not been proven existed or took place,* even in the most normal form—except in the mind of the recipient.

"Applied to the facts of this case, we have psychiatric testimony that paints plaintiff as a man whose adaptive mechanisms had begun to fail. His compulsions centered around his job. While his characterizations of specific work situations would normally be characterized as 'unrebutted,' we are forced by the medical description of plaintiff's personality to find that it is *at least* as likely an inference that these were imagined. There was no corroborating testimony. Compensation is not payable simply because an employee becomes *unable* to perform or cope with his job—it hinges on whether causal relationship can be proven between that physical or mental inability (disability) and the work that has gone before.

"In this case we believe and find that plaintiff brought to the workplace both his predisposition to the mental condition, *and* the internal stimulus that eventually led to his disablement. We are not convinced that this record demonstrates even the normal work duties of plaintiff as having aggravated, accelerated or combined with his personality disorder to produce disability." Opinion on remand, pp 2, 5.[4]

---

[4] The minority opinion upon remand found for compensation:

"The unrebutted lay evidence submitted in this case shows plaintiff was employed 35 years by defendant without any indication of difficulty. Plaintiff was then assigned to employment for another six years which was beyond his mental capacity to properly assimilate. This last work resulted in a break with reality and disablement which all medical evidence before us agree prevents his reemployment. There

## DISCUSSION

This Court views the *real* problem underlying these three cases to be whether the WCAB identified and correctly applied the legal standard for establishing legal causation in workers' compensation cases involving mental and nervous injuries. More succinctly, the Court must decide whether the WCAB properly states the causal nexus to be established by plaintiffs who allege that their disabilities and injuries are psychoneurotically or psychotically rooted[5], *i.e.,* arose "out of and in the course of" their employment milieu.

was no evidence which showed that plaintiff was unable to cope with the realities of life in general outside the course of his employment during the six years which he had difficulty at work. Neither were there any proofs presented from which it would be reasonable to conclude that plaintiff was subjected to conditions outside the course of his employment during the last six years thereof which he was unable to assimilate within his mental capacity.

"The only medical evidence before us which accepted the above factual premise was the testimony of Dr. Dreyer. It was pointed out in the prior dissent filed by Mr. Jarrett that Dr. Fink's opinion, ' * * * was based upon his impression that real work pressures were nonexistent' and that this doctor's opinion had origin in the fact that the history which he had received disclosed, ' * * * no real examples of work pressure based upon his (the doctor's) experience in viewing "expectation in industrial employ[ment]" through many years of walking through industrial plants.' It was further noted in the dissent filed that Dr. Fink admitted that the plaintiff felt real pressures in his work but it was Dr. Fink's impression that such pressures were purely subjective. If the acceptance of this doctor's testimony as is here done in the majority decision is not contrary to the rule that 'the perceived work environment' be used in determining the effect the employment had upon the claimant then it would seem that it would be impossible for the Supreme Court to enforce this rule if such conclusions are accepted as findings of ordinary facts which are beyond the scope of review by the Court." Opinion on remand, p 6.

[5] Psychoses and psychoneuroses are generic terms describing certain types of mental and nervous disorders.

Psychoses involve more serious personality disruptions than do psychoneuroses. Psychotic individuals usually suffer severe disturbances in all areas of their lives and may lose contact with reality.

Psychoneurotic individuals suffer milder disturbances in their lives and usually maintain some contact with reality. See English & Finch, *Introduction to Psychiatry* (New York: W W Norton & Co, Inc, 3d ed, 1964), p 44.

However, before tackling this very complex question, we must analytically identify the types of cases in which psychoneuroses or psychoses are involved. This Court, of course, assumes that it is clear that Michigan law permits compensation for disabilities and injuries rooted in psychoses which are "causally" established as arising "out of and in the course of" the employment relationship. See *Klein v Len H Darling Co*, 217 Mich 485; 187 NW 400 (1922).

Generally, workers' compensation cases involving emotional, nervous, psychoneurotic or psychotic (*i.e.,* mental) conditions have been divided into three[6] groups:

1. a mental stimulus resulting in a physical injury;

2. a physical trauma or stimulus resulting in mental injury (emotional, nervous, psychoneurotic or psychotic); and

3. a mental stimulus resulting in a mental injury (again, emotional, nervous, psychoneurotic or psychotic).[7]

Workers' compensation referees and boards have been most willing to grant awards in the first type

This decision deals with both phenomena in their generic senses. It is realized that both psychoneurotic and psychotic reactions can take on various forms such as anxiety reactions, phobic reactions, obsessive-compulsive reactions, conversion reactions, dissociative reactions, depressive reactions, and the like. See generally, English & Finch, *supra.*

[6] 1A Larson, Workmen's Compensation Law, §§ 42.20-42.24.

[7] Larson discusses a fourth group of mental injuries which he denotes as "compensation neurosis":

"The most controversial mental-injury question is that of the compensability of 'compensation neurosis.' 'Compensation neurosis,' which must be distinguished from conscious malingering, may take the form of an unconscious desire to obtain or prolong compensation, or perhaps of sheer anxiety over the outcome of compensation litigation—in either case producing a genuine neurosis disabling the claimant."

Since none of the three instant cases involves such a claim, we need not address the problem. Larson, *supra,* § 42.24.

of case: an employee suffers a work-connected mental blow or trauma which results in a psychoneurosis or psychosis that has a physically disabling effect. *Klein v Len H Darling Co, supra,* represents the archetypal Michigan case in this area.

In *Klein,* a 1922 case, this Court held that a mentally stimulated emotional shock to an employee was a compensable injury. Plaintiff Klein accidentally had allowed a piece of machinery to slip and strike another employee on the head. Klein became anxious and fearful that he had killed his co-worker. He remained in a highly anxious, nervous condition during the next four days at work. Klein eventually became delirious, went into shock and died seven days later. The Court awarded compensation to Klein's family, based on the theory that a mental stimulus or trauma which occurred during his employment had resulted in the physical injury.

Most jurisdictions have also been willing to award compensation for a mental injury (traumatic neurosis, conversion hysteria and hysterical paralysis are the most common injuries) when the plaintiff's disability results from a physical trauma or stimulus.[8] The leading Michigan case is *Johnson v Vibradamp Corp,* 381 Mich 388; 162 NW2d 139 (1968). In that case, plaintiff Johnson suffered a compensable hernia in the course of his employment. He was eventually released by his physician to return to work. However, the employer corpora-

---

[8] Again, it is incumbent upon us to caution the reader that this Court cannot attempt to categorize and discuss in this opinion every conceivable kind of neurotic, psychoneurotic, psychotic, depressive; or functional overlay, hysterical symptom, personality disorder. This Court attempts to be all-inclusive by using the general term "mental", while focusing on psychoneurotic or psychotic phenomena. However, the Court does not intend to exclude other associative phenomena.

tion refused to reinstate him. The plaintiff then developed a functional overlay[9] with regard to a back condition and could not return to work. This Court held that plaintiff's functional overlay was a compensable disability. Also see *Redfern v Sparks-Withington Co,* 353 Mich 286; 91 NW2d 516 (1958), and *Harris v Castile Mining Co,* 222 Mich 709; 193 NW 855 (1923).

The third and most difficult type of cases involves those where a plaintiff seeks compensation for mental injuries resulting from nervous or mental stimuli. There appears to be a jurisdictional split in authority on compensability in these cases.[10] However, Michigan clearly adopts the progressive view which allows for compensation. *Carter v General Motors Corp,* 361 Mich 577; 106 NW2d 105 (1960). In *Carter,* plaintiff's paranoid schizophrenia was found to have resulted from the emotional pressures encountered by him in the daily performance of his work. The Court held that plaintiff developed a compensable psychosis due to his worry over his inability to maintain the established production rate of the assembly line.

Turning to the instant cases, we should categorize the disabilities and injuries alleged by plaintiffs Deziel, Bahu and MacKenzie.

Plaintiffs Deziel and Bahu's alleged disabilities and injuries clearly fall within the second classification. They posit that certain physical traumas or stimuli led to their mental/psychotic injuries. In *Deziel,* it is claimed that plaintiff's test tube accidents, especially the one involving the splattering

---

[9] In lay terminology, a functional overlay describes a "psychogenic overlay". It is an "emotionally determined increment to an existing symptom or disability which has been of organic or physically traumatic origin". See 17A Words and Phrases, Functional Overlay, p 539.

[10] See Larson, *supra,* § 42.23, fns 81 and 82, for a state-by-state analysis.

of iodine, resulted in a mental injury and subsequent disability. In *Bahu,* it is claimed that plaintiff's back injury resulted in a mental injury (functional overlay) and subsequent disability.

Plaintiff MacKenzie's alleged injury and disability falls into our third classification. He posits that certain nervous/mental stimuli led to a mental injury and disability. In *MacKenzie,* it is claimed that the pressures of plaintiff's work situation resulted in mental injury and subsequent disability.

In all these cases, it is now clear, after remand, that (1) the three plaintiffs are "disabled" and that (2) the plaintiffs are disabled "on account of some 'personal injury' ". The respective referees and appeal boards have unanimously answered these two questions in the affirmative.

Our Court is thus confronted by this difficult question: did the WCAB utilize the correct standard in determining whether the plaintiffs' *employment* aggravated, accelerated, or *combined with some internal weakness or disease to produce the disability.*[11] This court must decide whether the WCAB correctly applied Michigan's standard for legal causation in cases involving alleged mental injuries and disabilities.

The initial consideration, then, is what is the causal nexus to be established by a plaintiff (psychoneurotic or psychotic) who is admittedly "disabled" "on account of some 'personal injury' " *and* claims that his employment "combine[d] with some internal weakness or disease to produce the disability".

---

[11] The focus is on whether plaintiffs' employment "combined with some internal weakness or disease to produce the disability". In most cases involving alleged mental injuries, the condition is usually latent to some degree and only becomes patent upon a "triggering" or precipitating event, *i.e.,* a personal injury. See *infra,* 27.

We hold, as a matter of law, that in cases involving mental (including psychoneurotic or psychotic) injuries, once a plaintiff is found disabled and a personal injury is established, it is sufficient that a strictly *subjective* causal nexus be utilized by referees and the WCAB to determine compensability. Under a "strictly *subjective* causal nexus" standard, a claimant is entitled to compensation if it is factually established that claimant *honestly perceives* some personal injury incurred during the ordinary work of his employment "caused" his disability. This standard applies where the plaintiff alleges a disability resulting from either a physical or mental stimulus and honestly, even though mistakenly, believes that he is disabled due to that work-related injury and therefore cannot resume his normal employment. See Anno: *Workmen's compensation: neurasthenia as compensable,* 44 ALR 500.

The focal point of this standard is the plaintiff's *own* perception of reality.

This standard is not adopted haphazardly. This Court is fully cognizant that the area of workers' compensation relating to alleged mental injuries is fraught with the dangers of malingering, shamming and even fraud. However, upon careful consideration of the complex nature of the psychoneurosis-psychosis problem, we feel compelled to adopt the aforementioned standard. We do so for basically five reasons:

1) any objective causal nexus standard would not suffice;

2) the inherent nature of psychoneuroses and psychoses is subjective;

3) stare decisis impliedly requires a subjective standard;

4) a subjective standard is mandated by the

requirement that remedial legislation be construed liberally; and

5) the workers' compensation referees, with the assistance of the WCAB, have the ability to detect malingerers in mental injury cases at the fact-finding level.

1.

Any *objective* causal nexus standard would not suffice when examining compensation cases alleging psychoneurotic or psychotic disabilities and injuries. This is true because almost all psychoneuroses and psychoses are, to some degree, latent in origin. The claimant's predisposition for such disabilities usually can be traced back to childhood. Therefore, a "but-for" or other objective proximate causation test will not be helpful in determining whether the claimant's employment "combined with some internal weakness or disease to produce the disability".

"Unfortunately, the complex etiology of psychoneurosis and the demands of time for examination are such that in a substantial number of cases a psychiatrist will be unable to estimate with any degree of accuracy the probabilities of the injury occurring in the absence of employment. All major schools of psychoanalytic thought agree that although immediate factors of reality may serve as precipitating or exciting causes, the adult's predisposition towards a psychoneurotic reaction lies in the childhood. The existence within the unconscious of unresolved conflicts, aggression, unrecognized motivations, and repressed hostilities from childhood onward may create conflicts with which the ego is incapable of coping. The individual is then particularly susceptible to the production of a psychoneurotic reaction as a way of relieving any additional tension. Whether a given experience or combination of experiences will trigger the psychoneurotic potential into a

psychoneurosis will depend on the vulnerability of the individual and the nature and duration of the stresses bearing upon him. (Footnotes omitted.)" Cohen, Comment: *Workmen's Compensation Awards For Psychoneurotic Reactions,* 70 Yale L J 1129, 1142-1143 (1961).

Any objective causation standard, whether it be in the form of the "but-for" or the "aggravation-acceleration" rule, will be of little assistance in deciding whether to award compensation in cases involving psychoneuroses or psychoses. Perhaps some direct causal nexus with an employment event can be established in a few cases. But in most cases a constellation of psychodynamic factors is involved; therefore, it is almost impossible to weigh the causal significance of any one factor. Indeed, it has been posited that the utilization of an objective legal causal analysis in these psychoses cases would be analogous to entering a maze without a map. Psychoneuroses and psychoses take on so many shades and forms as to show no logical pattern vis-à-vis any notion of objective legal causation.

The result to date of this fundamental misunderstanding of the causation problem is that referees and the WCAB often are forced to manipulate the causal nexus in order to grant or deny compensation on an *ad hoc* basis.

2.

The only conceptually sound method for analyzing psychoses or psychoneuroses is to recognize that these illnesses constitute, by definition, *subjective* injuries and disabilities. As such, they only exist within the minds of their unfortunate victims.

Simply stated, psychoses and psychoneuroses are mental disorders which are rooted in unconscious mental causes. In finding solutions to their unconscious problems, psychoneurotics and psychotics develop personality problems which make it difficult for them to adapt to reality as it is encountered by so-called "average" or "normal" individuals. This failure of the psychoneurotic or psychotic's reactions and adjustment mechanisms can either distort his perception of reality or, in the worst psychotic cases, cause the individual to lose contact with reality and suffer severe disturbances in all areas of his life.

Although laymen and logicians may view the psychoneurotic or psychotic's perception of reality as unrealistic, the disturbance which the individual experiences is not imaginary to him. The subsequent incapacity is as real to the claimant as that resulting from a clearly discernible "physical" disability.

Professor Arthur Larson, in his article on *Mental and Nervous Injury in Workmen's Compensation,* explores why the layman misunderstands the nature of mental injury:

" '[H]ow could it be real when * * * it was purely mental?'

"This poignant judicial cry out of the past, which I occasionally quote to put down my psychiatrist friends, contains the clue to almost all of the trouble that has attended the development of workmen's compensation law related to mental and nervous injuries. This equation of 'mental' with 'unreal,' or imaginary, or phoney, is so ingrained that it has achieved a firm place in our idiomatic language. Who has not at some time, in dismissing a physical complaint of some suffering friend or relative, airily waved the complaint aside by saying, 'Oh, it's all in his head?' " 23 Vanderbilt L Rev 1243 (1970).

This "poignant judicial cry" can only be explained if it is understood that *all* people manufacture their own concepts of reality. "Normal" persons are those who manufacture a reality which most closely parallels that which the vast majority of "average" people encounter. Psychoneurotics and psychotics fail to manufacture or encounter the same reality because their reactions and adjustment mechanisms either distort, warp or completely fail.

However, their distorted concept of reality is just as "real" for them as the average person's concept of reality is for him. This is the critical insight.

Once it is determined that (1) a psychoneurotic or psychotic is disabled and (2) a personal injury is established, it is only logical that we employ a *subjective* standard in determining whether the claimant's employment combined with some internal weakness or disease to produce the disability. A subjective standard acknowledges that the claimant is "mis-manufacturing" or misperceiving reality, otherwise the person would not be a psychoneurotic or psychotic by definition.

What the referee and WCAB must factually determine, with the aid of competent psychiatric evidence, is whether the claimant is *honestly* misperceiving reality. It is always a psychological "given" that the claimant is distorting reality or the claimant would not be classified as a psychoneurotic or psychotic.[12]

Thus it becomes incumbent on the finder-of-fact to determine whether the claimant honestly, even though mistakenly, believes that he is disabled on

---

[12] It is also a "given" that the employer accepts the employee at the gate with all his latent foibles and weaknesses, including latent psychoneuroses and psychoses. See, *inter alia, Zaremba v Chrysler Corp*, 377 Mich 226; 139 NW2d 745 (1966).

account of some work-related personal injury, physical or mental, and therefore cannot resume his normal employment. Any attempt to take the inquiry to an objective level, *i.e.,* "did claimant's employment *really* combine with some internal weakness or disease to produce the disability?", is bound to lead to frustration and eventually ad hoc manipulation. This is true because in most cases the question is unanswerable.

### 3.

Our reading of stare decisis in Michigan impliedly requires the use of a subjective standard in compensation cases involving psychoneuroses and psychoses. *Carter v General Motors Corp, supra,* has long been recognized not only as the leading Michigan case, but probably as the landmark case in the nation in this area of workers' compensation law. *See* Malone, Plant & Little, Cases and Materials on the Employment Relation, pp 276-290.

In *Carter,* the Court did not address the precise problem of what causal nexus is sufficient to find compensation in cases where the claimant is disabled as a result of a personal injury and honestly, though perhaps mistakenly, perceives his disability as work-related.

However, a careful reading of *Carter* leads to the inescapable conclusion that the Court employed the subjective standard in determining whether plaintiff's claimed disability and injury involving psychosis was compensable. A brief sampling of the expert testimony quoted by the Court in that case so demonstrates:

" 'The *patient saw himself* as in an impossible situation in which he couldn't win. He couldn't please the

foreman operating the machine in his job the way he was. If he attempted to do it the foreman's way he would fall behind in his work and the men on the line would complain and the foreman would get after him for this. So *he really felt himself* caught in an impossible situation which had no solution.

* * *

" 'Now, I feel that here we had an unhappy combination of circumstances, that after a period of a layoff the man comes into a new job which for somebody, I think with the relative inflexibility of personality that this man had, required some adaptation. So that already he was working in a new position with which he was not familiar and he found himself in a—as I believe I described it before, *in what to him* was an impossible situation. Namely, that he could not meet the foreman's demands and stay on the work and doing it the way the foreman wanted him to do, and on the other hand, if he did keep up, then his job was threatened in that fashion. So that *he actually felt* that the job which he had described to his wife as liking very much was threatened in either way. We frequently see a situation of this type where *the person feels himself trapped* in a situation that has no solution, at least to them, precipitating a schizophrenic breakdown. And I think the indications are that this is what occurred here. * * * ' " (Emphasis added.) 361 Mich 583-584.

The Court, in quoting the proffered psychiatric testimony, clearly employed a strictly subjective causal nexus. The Court and the psychiatrist were concerned with how the "patient saw himself", how "he really felt himself", etc.

The Court, without precisely stating so, analyzed how this particular injured and disabled claimant perceived reality, even though it is very probable that, due to latent psychoses, he misperceived his employment situation.

Judge BRONSON of the Court of Appeals astutely

commented on the implicit *Carter* analysis in his dissent in the instant *MacKenzie* case:

"It is inconceivable that the inquiry should be shifted by such analytical [sleight] of hand from the disabled employee's ability to withstand the alleged injurious working conditions to an abstract evaluation of the injurious nature of the work environment. *Plaintiff's perception of his work environment is indispensable to an attempt to establish a causal relationship between his employment and disability.* The Court in *Carter* recognized this interrelationship by quoting the physician's testimony describing *Carter's* distorted view of his job in detail. The inquiry in *Carter* was not whether the job created pressures or difficulties for any other employee, but whether they created *an impossible situation for Carter* given his pre-existing mental condition or infirmity. The employee's ability to cope with his job is indispensable to the issue of causation and should not be lost in analytical diversions." (Emphasis added) 48 Mich App 180.

Judge BRONSON recognized the critical causal nexus is ultimately dependent upon how Carter himself, a psychotic, perceived or misperceived the relationship between his disability/injury and his work environment. The analysis employed comports with our strictly subjective standard.

### 4.

There exists a frequently quoted maxim or "rule of construction" to be applied by courts in interpreting remedial legislation such as workers' compensation acts: *remedial legislation should be construed liberally.* See, *inter alia, Van Dorpel v Haven-Busch Co,* 350 Mich 135, 154; 85 NW2d 97 (1957).

Rules of construction are often rotely cited and thus their underlying rationales are lost. However,

we ought not lose track of the rationale for such a rule of construction in workers' compensation cases.

Workers' compensation laws were originally enacted in order to remove work-related injuries from the realm of tort law. Regardless of fault, liability was imposed on employers for any worker's loss of earning capacity due to *disability*. Most vestiges of tort law have been erased. Complicated legal theories of duty, breach of duty, negligence, contributory negligence, causation, proximate causation, etc., have been abolished.

The social and economic reasons for the abolition of the previous system are too well known to require further explication here.[13]

In the area under examination only a very general notion of causation was carried over into compensation law. Namely, the injury and the subsequent disability must arise "out of and in the course of" employment. But this very general notion of causation was and should always be read progressively or liberally.[14] The primary goal of

---

[13] Briefly, it was recognized that under the tort law system:

"a) large portions of all fatal and non-fatal injuries remained uncompensated, b) the sums actually paid were frequently inadequate token compensation, c) recoveries were obtained only after protracted litigation, d) the attorneys of the injured workmen retained a large share of the sum actually obtained, [and] e) an undue portion of the premiums paid by industry went to the insurance companies for profits, administrative costs and profits and was thus socially wasted." See Riesenfeld & Marshall, Modern Social Legislation (Brooklyn: The Foundation Press, Inc, 1950), p 137.

On the other hand, the goals of the workers' compensation laws are:

"1) to compensate the worker, his dependents, or survivors for at least part of the wage loss and medical expenses incurred as a result of industrial injury, 2) to rehabilitate the employee so that he can re-enter the labor force and again become a productive member of the community, and 3) to provide a monetary incentive to the employer to minimize occupational injury." Cohen, *supra,* 1130.

[14] By progressively or liberally, this Court means "for compensation". If a disabling injury is incurred and the general circumstances

workers' compensation is to compensate a worker
for his disability loss. When there is doubt which
might lead a court to deny recovery under the tort
law system, recovery under workers' compensation
law is often allowed. Compensation for disability
takes preference over any subsidiary doubts about
the existence of an objective causal nexus.

The spirit in which compensation laws were
enacted should not be lost in legalistic tort nice-
ties.

It is with these equitable concepts in mind that
this Court adopts the subjective standard in cases
involving mental disabilities and injuries. When
there is agreement that the worker is disabled and
a work-related personal injury is established, a
liberal construction of the causal nexus should be
applied in deciding whether to award benefits. If it
can be satisfactorily established that the worker
honestly, though mistakenly, perceives that his
employment-related injury is responsible for his
disability, benefits are to be awarded.

### 5.

Employers are concerned that the utilization of
a strictly subjective causal nexus standard in cases
involving mental disabilities may encourage malin-
gering,[15] shamming and outright fraud. This Court

---

lead to the conclusion that it was work-related, compensation should
be awarded.

[15] Malingering should be distinguished from "compensation neuro-
sis". See fn 7, *supra*.

"The borderline between neurosis and malingering is tenuous and
uncertain. For empirical purposes, psychiatric literature differentiates
by saying malingering involves the conscious counterfeiting of physi-
cal signs for the purpose of secondary gain, whereas, conversion
hysteria involves the subconscious counterfeiting of physical signs for
the purpose of secondary gain. Simply stated, traumatic neurosis
supposedly is predicated upon subconscious deception for the purpose
of obtaining money, whereas malingering is conscious deception of

understands and shares the employers' concern, even though that apprehension may be slightly exaggerated. Employers seem to operate under the assumption that mental injuries by their very nature are more difficult to substantiate and, therefore, less genuine than physical injuries.

First, modern legal and medical theory does not lend credence to that assumption:

"The separate category reserved for 'physical' injuries has little support in psychiatric theory, which regards man as an integrated being. The rule is sometimes rationalized, however, by appeal to administrative considerations. It is contended, for example, that the 'physical' injury requirement will guarantee the genuineness of the claim. But use of this rule as a protective device places a heavier burden of proof on those suffering from mental disturbances without any basis for such a distinction. In fact, conscious simulation of the often complex patterns of psychoneurotic reactions may be easier to detect than certain feigned 'physical' injuries such as whiplash or back injury. While detection of falsified claims may be made difficult if the testimony of medical witnesses is partial or perjured, this danger seems no less present in cases where there has been a physical impact or injury." (Footnotes omitted.) See Cohen, *supra*, 1137.

Second, the referees, with the assistance of expert psychiatric testimony and under the watchful eye of the WCAB, are skilled in detecting malingerers at the fact-finding level:

"In the last analysis, the problem of malingering is one of fact, which must be left to the skill and experience of medical and psychiatric experts, and of compen-

others for the purpose of obtaining money." Turner, *The Anatomy of Psychiatric Cross Examination*, 34 Kan State Bar Ass'n J 93, 96 (1965), reprinted in Selzer, Psychiatry for Lawyers Handbook (Ann Arbor: Institute of Continuing Legal Education, 1966), pp 89, 95-96. Cited by appellee General Motors Corporation's brief, pp 19-20.

sation administrators, who usually manage in time to develop considerable facility in detecting malingerers at the factfinding level." See Larson, 23 Vanderbilt L Rev 1259.

Furthermore, in positing a strictly subjective standard for the causal nexus in mental injury cases, this Court is not infringing on the historic fact-finding function of the referees or the WCAB. Const 1963, art 6, § 28. The referees, in conjunction with the WCAB, remain charged with determining (1) whether the worker/claimant is disabled and (2) whether a personal injury (a precipitating, work-related event) occurred. This Court is only requiring that the subjective causal nexus standard be utilized in deciding (3) whether the claimant's employment combined with some internal weakness or disease to produce the disability. All three questions must be answered in the affirmative and supported by the record for compensation to be awarded. The referees and the WCAB have the competence to detect malingerers at one of these three levels of inquiry.

## DEZIEL

Upon remand, the WCAB held (1) that plaintiff Deziel was disabled and (2) that a work-related personal injury had occurred. However, the board denied compensation on the grounds that Deziel's employment did not aggravate, accelerate or combine with some internal weakness or disease to produce the disability.

We reverse. We conclude that there is no competent evidence to support the appeal board's finding of fact. *White v Revere Copper & Brass, Inc,* 383 Mich 457, 462-463; 175 NW2d 774 (1970).

It is clear to this Court that if the board had

utilized the strictly subjective standard for establishing the causal nexus, it would have awarded compensation. The undisputed evidence demonstrates that plaintiff Deziel honestly, though perhaps mistakenly, *perceived* the "cause" of her disability to be the work-related personal injury. It makes no difference under the aforementioned standard whether the injury *really* caused the disability or whether, due to some latent psychoneurosis or psychosis, the plaintiff misperceived the cause of her disability.

The WCAB cannot draw inferences contrary to the undisputed evidence. *White, supra.*

In the instant case, both plaintiff Deziel's and defendant Difco's expert psychiatric witnesses testified that she honestly perceived the work-related personal injury to be the cause of her disability.

Plaintiff Deziel's expert psychiatric witness, Dr. Herbert A. Raskin, testified thus:

*"The diagnosis established is that of psychoneurotic reaction, conversion reaction type.* It would appear that the accident incurred in April, 1969, served as the precipitating focus of psychodynamic changes, which produced the psychopathology observed and reported.

*        *        *

"It is quite doubtful that Mrs. Deziel would be able to return to her former type of employment. It would be advisable for her to seek psychiatric consultation in order to aid in meeting with the emotional disturbance diagnosed above. It cannot be estimated at this time how long duration of psychotherapy would be prior to her being able to resume work.

*        *        *

"*Q.* One last question, Doctor. Does this woman have a conscious understanding of what mechanism is going on in her, or is this unconscious?

"*A. The psychoneurotic reaction is repeatedly unconscious.* I do not feel that she had any significant degree

of conscious understanding or insight, awareness, and knowledge of what she was experiencing.

"*Consciously, she is convinced that something is organically wrong with her eye, that something is organically wrong with her as a total person.*" (Emphasis added.)

Defendant Difco's expert psychiatric witness, Dr. Gordon R. Forrer, confirmed plaintiff's perception of her disability but labeled it psychotic:

"*Q.* Isn't it true that the eye seems to be the source of the problem to her because that is the place where she suffered the trauma?

"*A.* No. It is not because it is the place where she suffered the trauma; it is because her life would be more comfortable if she were blind to all of the unhappinesses which have happened to her life and, as a matter of fact, she is in a sense blind, because she can't tell you much about herself. She has closed her eyes to herself.

"*Q.* The excuse to do that, though, was an eye injury, isn't that right?

"*A.* Not the excuse, but a hook which was a happenstance that came along which fit right in chance-wise.

"*Q.* Something to hang her hat on, you might say?

"*A.* Yes. In fact, it is very likely that if it had happened at some other time in her life she wouldn't have latched on to it. This kind of thing happens frequently. *A person gets repeated injuries of the same kind, and they only respond psychotically to one because it happens to her at such a time in life when all the factors, when the combination has been made that it just takes that one thing that they latch onto.*

\* \* \*

"*Q.* Doctor, when Mr. Kelman asked you if the plaintiff might hang her hat onto something, this is not an opinion you share with the plaintiff, is it?

"*A.* Well, the plaintiff doesn't look upon this as something to hang her hat on. This is an explanation of what she is doing but she doesn't think this. *She thinks*

*that what she experiences and what she feels is all
related to the splash of iodine, and this has produced
what she alleges to be an incapacity to work.* That is
her theory.

"*Q.* And why does, in your opinion, she feel this way?
Is this a valid feeling?

"*A. Well, she has this conviction, but it is psychotic.
It is because her logic is incorrect. She ascribes to a
superficial injury enormous catastrophic consequences
which don't make sense. It is psychotic.*" (Emphasis
added.)

The evidence is undisputed. The plaintiff, either
a psychoneurotic or psychotic (depending on which
theory is adopted), honestly, though mistakenly,
perceives the work-related personal injury to be
the cause of her disability. This evidence satisfies
this Court's subjective standard.[16]

We vacate the order of the WCAB and remand
the case for proceedings not inconsistent with this
opinion. Jurisdiction is not retained. No costs.

[16] Defendant Difco and the board attach significance to the testi-
mony of Dr. Brewer. Dr. Brewer, a physician, evidently treated Deziel
years earlier for some, but not all, symptoms which she experienced
after the iodine accident.

The record reflects that Deziel denied she had been previously
treated for the same symptoms which resulted from her injury. Difco
and the board believed that Dr. Brewer's testimony served to impeach
Deziel's testimony.

The record, however, indicates that Dr. Brewer never disclosed to
Deziel any of the conditions which he suspected or diagnosed. He only
noted them for his own records. Furthermore, those latent conditions
only became totally patent after the work-related injury occurred and
Deziel became disabled. (Also, Dr. Brewer could not recall treating
her for any eye pain.)

Both psychiatric experts gave evidence which established that
plaintiff Deziel, either a psychoneurotic or a psychotic, misperceived
the cause of her disability. Neither expert witness accused Deziel of
malingering; in fact, defendant's expert witness testified she was *not*
malingering. Therefore, Dr. Brewer's testimony is neither enlighten-
ing nor relevant to a subjective analysis. It serves to buttress the fact
that Deziel misperceived the cause of her disability. It does not
establish malingering or fraud. Furthermore, we note that Dr. Brewer
did not suggest that Deziel was malingering, nor does the record
reflect that he would be qualified to testify as an expert in this area.

BAHU

Upon remand, the WCAB held (1) that plaintiff Bahu was disabled; (2) that a work-related personal injury did occur; and (3) that Bahu's employment did aggravate, accelerate or combine with some internal weakness or disease to produce the disability. Compensation was awarded.

We affirm. We conclude that the board's finding of fact is supported by competent evidence. *White, supra.* The board correctly utilized the strictly subjective standard in establishing the causal nexus:

" 'In summary, plaintiff may have been an emotional "accident waiting to happen," but the accident did happen (injury stipulated) and per his unimpeached testimony the residuals thereof have continued and have disabled him. That is all the plaintiff knows or all he is capable of having insight regarding. *The expert witnesses tell us there is no physical disability remaining except that in plaintiff's mind a real disability [remains]. This is a psychiatric disability "precipitated" by a sequence of events including the work injury (per Dr. Dorsey), which injury was a "hook on which he can attach causation" (per Dr. Forrer).*

" 'This writer submits the referee's awarding of partial compensation during the brief periods of subsequent employment, and an open award of weekly benefits has record support. There are not proofs to justify reversal.' " (Emphasis added.)

The appeal board correctly states that plaintiff Bahu honestly, though perhaps mistakenly, perceived the "cause" of his disability to be the work-related personal injury. The board astutely implies that it makes no difference under this standard whether the injury *really* caused the disability. It is enough that, due to some latent psychoneurosis

or psychosis, the plaintiff perceives the stipulated injury to be the cause of his stipulated disability.

Both plaintiff Bahu's psychiatrist, Dr. Dorsey, and defendant Chrysler's psychiatrist, Dr. Forrer, concurred in their analysis of Bahu's condition. Dr. Forrer's testimony was particularly illuminating:

"*Q.* [D]id you find any evidence whatsoever of a possible psychiatric problem or disability related to his injury which he * * * did actually sustain at Chrysler during his employment there?

"*A.* Well, there is a relationship, but the relationship is not cause and effect, and the relationship is not aggravation. The relationship is this, that an event happens in such an individual's life and he has a background * * * he is all set up to attach to some dramatic event in his life 'causations' which do not in reality belong there. *But this performs the function of a convenient hook on which he can attach causation for troubles of all kinds and once this is set up, this traumatic event becomes the assigned cause by the patient.* Then, he very quickly forms a way of looking at life—'Before this event everything was all right and after this event nothing was all right.'

* * *

"*Q.* [T]his process that you've described of a convenient hook to attach his troubles to and so on is an unconscious process?

"*A.* Yes.

* * *

"*Q.* He actually does believe that he has the pain?

"*A. Not only that, he does have pain.*" (Emphasis added.)

We affirm the order of the WCAB. No costs.

MacKenzie

Upon remand, the WCAB held (1) that plaintiff

MacKenzie was disabled and (2) that a work-related personal injury had occurred. However, the board denied compensation on the grounds that MacKenzie's employment did not aggravate, accelerate or combine with some internal weakness or disease to produce the disability.

We reverse. We conclude that there exists no competent evidence to support the appeal board's finding of fact. *White v Revere Copper & Brass, Inc, supra.*

It is once again apparent to this Court that had the board utilized the strictly subjective standard for establishing the causal nexus, compensation would have been awarded. The undisputed evidence demonstrates that plaintiff MacKenzie honestly, though perhaps mistakenly, perceived the cause of his stipulated disability to be the undisputed work-related personal injury. The WCAB cannot draw inferences contrary to the undisputed evidence. *White, supra.*

Both plaintiff MacKenzie's and defendant General Motor's expert psychiatric witnesses testified that he honestly, though perhaps mistakenly, perceived the work-related personal injury to be the cause of his disability.

Plaintiff MacKenzie's psychiatrist, Dr. Joel Dreyer, testified thus:

"*Q.* Doctor, do you have an opinion based upon the history which you took and the examination which you performed as to whether or not at the time this man stopped working he was disabled from working?

"*A.* Yes, I have an opinion.

"*Q.* What is that opinion?

"*A. He was disabled.*

"*Q.* What was the cause of his disability?

"*A. I feel work was the cause of his disability.*

"*Q.* Doctor, do you have an opinion as to whether or not this man still is disabled?

"*A.* Yes, I do. I feel that at least when I saw him at the time in January and without any intervention I feel he is still disabled.

"*Q.* Doctor, this role that the stress of his employment played, if this man were engaged in any stressful situation would this have occurred?

"*A.* *Well, certainly he had the potential to get into trouble in any stressful situation,* but this man would be more likely to get in trouble at something he did ritualistically by fighting his compulsive pattern rather than an individual stress. *This kind of guy would be more likely to break from daily stress rather than an incident.*

"*Q.* So what you are saying then is the constant stress of the work from day to day was the thing that apparently caused this man's problems?

"A. Yes.

"*Q.* Doctor, if this man had previously been given a job where there were no stressful obligations, no responsibilities as such, would he have then been able to continue to function or be more able to continue to function?

"*A. His interpretation of what stress is—for instance I don't know how heavy or difficult his work was per se, I only know it from how he tells it to me, and again it could be a distortion of some of the facts, but it is how he perceives it and not how stressful it is and he certainly perceived it was stressful for him to handle. I have seen people decompensate who felt sweeping was too stressful, so if it is his perception it is stressful then that is his stress.*" (Emphasis added.)

Defendant General Motors' psychiatrist, Dr. Jerome Fink, confirmed plaintiff's perception of his disability:

"*Q.* I see. Doctor, you also indicated to Mr. Poppe that this man was unable to—you were unable to ascertain any realistic pressures that this man was subjected to?

"*A.* That is correct.

"*Q.* He did indicate to you that he felt he was subjected to pressure, didn't he?

"*A.* He indicated to me that he felt he was pressured, but that *this was a subjective pressure* because at no time was he able to give me specific examples of pressure situations, in my opinion, and I have been around long and made enough trips through Pontiac, Fisher Body Division, and other plants to get some idea what the usual run of expectation is in the industrial employ-[ment], and he gave me nothing which would indicate stress outside the usual run, the customary expectation of a man earning his living from a large corporation.

"*Q.* What you are saying then, Doctor, is you didn't feel he was subject to any unusual stresses?

"*A.* No, I'm not saying that.

"*Q.* Oh?

"*A.* I'm saying that I did not find in his history anything which to my satisfaction indicates unusual stresses.

"*Q. The stresses which he relates to you are real to him, are they not, Doctor?*

"*A. They are as real to him as the voice of the schizophrenic is to himself.*

"*Q. When he tells you that he was feeling subjected to pressure, he believed that he was being subjected to pressures, does he not, Doctor?*

"*A. Right or wrong, he believed it.*

"*Q. Whether he is right or not is—as a matter of fact, that is part of his disease?*

"*A. That's very important; this is the very basis of a mental illness.*

\* \* \*

"*Q.* Doctor, this man told you why he retired from General Motors, didn't he?

"*A.* I believe so.

"*Q.* He told you that the job was getting too much for him, didn't he?

"*A.* He told me he felt the job was getting too much for him.

"*Q. When he told you that, did he believe it?*

"*A.* Did who believe it?

"*Q.* Mr. MacKenzie.

"*A. Oh, he believes it, yes.*

"*Q. To him this problem was very real, was it not?*

"*A. To him, he believed it.*" (Emphasis added.)

The evidence is undisputed. The plaintiff, either a psychoneurotic or psychotic, honestly, though perhaps mistakenly, perceived the work-related personal injury (stipulated) to be the "cause" of his disability (also stipulated). This evidence satisfies this Court's subjective causal nexus standard.

We vacate the order of the WCAB and remand this case for proceedings not inconsistent with this opinion. Jurisdiction is not retained. No costs.

KAVANAGH, C.J., and WILLIAMS and LEVIN, JJ., concurred with BLAIR MOODY, JR., J.

COLEMAN, J. *(dissenting).* These three cases were remanded to the Workmen's Compensation Appeal Board (WCAB) for further proceedings and a clear statement in each case of the underlying reasons for the subsequent findings, *Deziel v Difco Laboratories, Inc,* 394 Mich 466; 232 NW2d 146 (1975). The WCAB has returned the cases with findings as ordered.

Our focus is upon the standards or criteria to be used in determining whether the employer was statutorily responsible for the employees' mental disorder. In each case the employee had "imagined/perceived/hallucinated"[1] a disabling injury.

The Michigan worker's disability act provides, in pertinent part, that a worker be compensated for "a personal injury arising out of and in the course

[1] The quoted phrase is taken from the WCAB's opinion, upon remand, in *MacKenzie.*

of his employment".[2] The first majority opinion in these cases *(Deziel, supra)* directed the finder of fact to utilize the following three-pronged test to determine whether the requisite causal nexus exists:

"1. Is the claimant disabled?

"2. If so, is the claimant disabled on account of some 'personal injury'?

"3. Did the claimant's employment aggravate, accelerate or combine with some internal weakness or disease to produce the personal injury?"

Although the WCAB followed the order of the Court, the majority today has changed the rule and adopts a new test for the finder of fact to apply apparently instead of the critical third inquiry—the "honest perception" test:[3]

"Under a 'strictly *subjective* causal nexus' standard, a claimant is entitled to compensation if it is factually established that claimant *honestly perceives* some personal injury incurred during the ordinary work of his

---

[2] The statute in full reads:

"An employee, who receives a personal injury arising out of and in the course of his employment by an employer who is subject to the provisions of this act, at the time of such injury, shall be paid compensation in the manner and to the extent provided in this act, or in case of his death resulting from such injuries the compensation shall be paid to his dependents as defined in this act. Time of injury or date of injury as used in this act in the case of a disease or in the case of an injury not attributable to a single event shall be the last day of work in the employment in which the employee was last subjected to the conditions resulting in disability or death." MCL 418.301(1); MSA 17.237(301)(1).

[3] The language chosen to set forth the majority's standard is particularly disturbing because of its ambiguity. If a claimant "honestly perceives" that "some" work-related "personal injury" "caused" his mental disability, then causal nexus is established, regardless of prior psychiatric history. For instance, if a worker "honestly perceives" that a broken finger "caused" his mental disorder, is nexus to be established? What if the injury is a scraped elbow? Surely the statute minimally requires some *medical evidence* connecting the injury and *subsequent* mental disorder before nexus is established.

employment 'caused' his disability. This standard applies where the plaintiff alleges a disability resulting from either a physical or mental stimulus and honestly, even though mistakenly, believes that he is disabled due to that work-related injury and therefore cannot resume his normal employment."

The Court again remands for compliance with the newest requirement. However, this standard is no standard at all in the reality of application. In cases where the "disability" and "personal injury" are established, the majority's test for causal nexus would result in an award of compensation for virtually all, if not all, claims based on mental disorders. If the claimant perceived that the job caused the problem, *even if this were not true,* the employer would be liable. The new formulation ignores both the fundamental nature of these mental disorders and the statutory requirement that causal nexus be *factually* established. It is noted in passing that the majority opinion takes away the WCAB's fact-finding role and substitutes the Court's version prior to this second remand of the case.

We would affirm the WCAB's findings pursuant to our prior remand. (Compensation was denied to Deziel and MacKenzie and awarded to Bahu.)

I

A brief summary of the facts and history of the cases follow:

*Mary Deziel*

Mary Deziel attributed headaches, tension, anxiety and dizziness to a splattering of iodine which occurred when she dropped a test tube. There was no physical damage and she was told to return to work the next morning. She testified that she had

never had such problems, never had received medication, treatment or hospitalization for them and that her problems were caused by her accident at Difco. Because she had lived in Canada all of her life (and continues to live there) excepting the months here involved,[4] inquiry was commenced in Canada, but *after* the referee's hearing. Before the WCAB, it was learned for the first time that she had been treated, medicated and hospitalized in the past for these same complaints.

Upon remand for application of the three-pronged test, the WCAB found no causal nexus between her alleged disability and her employment with Difco. The WCAB members were previously unanimous in speaking of Dr. Brewer's deposition:

"This deposition shows, with substantial weight, that plaintiff has been suffering from the same symptoms since 1962 [in Canada] and periodically thereafter which is most impressive to the point that her disability is not causally connected with her work."

Because plaintiff had denied suffering such previous similar disability and hospitalization caused by it when she in fact had a long history, including hospitalization, before her short time in the United States, her credibility also was impaired.[5]

---

[4] Mary Deziel came to live in the United States (Detroit) shortly before commencing employment with Difco Laboratories in September of 1968. She returned to Canada shortly after her accident on April 24, 1969.

[5] The record clearly reflects the extensive and prolonged history of medical and psychiatric problems suffered by Mary Deziel *before* coming to the United States. To summarize:

—She went to see Dr. Lloyd Brewer on June 2, 1962, complaining of dizziness, headaches, stomach problems and inability to breathe;

—Dr. Brewer treated her until September 15, 1962, when he hospitalized her for severe headaches and anxiety. She remained five days and was then referred to a psychiatrist and a neurologist. Tranquilizers were prescribed;

Despite this evidence, my brothers find "no competent evidence to support the appeal board's finding of fact" based on our first order of remand. The WCAB order was vacated and the matter again is remanded but with the fact-finding already completed by the Court (including application of the "honest perception" test for causal nexus).

*Yusuf Bahu*

Plaintiff Bahu was hired by defendant in August 1967. He worked on a stamping machine and

—In January 1963, she returned to Dr. Brewer complaining of dizziness;

—On March 16, 1963, Dr. Brewer saw her for a sore throat;

—On April 29, 1963, he saw her for mild anemia;

—On or about July 3, 1964, plaintiff was seen by Dr. Brewer for rhinitis;

—On September 20, 1965, plaintiff fell at work and struck her head and arm. She missed three days of work and saw Dr. Line, complaining of headaches and dizziness;

—Visits to Dr. Brewer on September 20, 1965 and October 1, 1965 resulted in improvement;

—On March 12, 1966, she was seen for acute sinusitis;

—On March 12, 1966, her medical complaint was lower back pain;

—In April 1966, she had a twisted knee;

—On April 29, 1966, she had viral bronchitis;

—In May 1966, plaintiff was seen twice, once for a facial rash and once for bronchitis;

—During September 1966, Dr. Brewer diagnosed her various ailments as resulting from nervous tension. He prescribed a tranquilizer —Librium;

—In November 1966, plaintiff suffered from cystitis, acute pyelonephritis and a bladder infection;

—In May 1967, she was still on Librium and complaining of headaches;

—Plaintiff was seen on June 6, 1967 for a tension anxiety state;

—She was seen on June 20 for pain in her face and given more tranquilizer prescriptions;

—On December 4, 1967 she had some stomach trouble;

—On January 31, 1968, plaintiff had another fall at work and hit her head and back. She received six weeks of compensation;

—On February 8, 1968, she was seen for a sore spot on her spine;

—From May 18-25, 1968, plaintiff was hospitalized for a kidney infection;

—Dr. Brewer last treated Mary Deziel on May 31, 1968 and diagnosed her psychiatric problem as a tension anxiety state.

complained of back problems. He had a myelogram performed and returned to work after about three weeks on October 7, 1968. He quit on January 4, 1969. He seeks workmen's compensation from Chrysler. He worked short periods of time at different places before and after this employment and completed a beautician's course but did not pursue work in that field. Although no physical disability was found, expert testimony was to the effect that plaintiff experienced "cultural dissonance" upon coming to this country from the Near East. He married an ex-nun, a college graduate (he had no college education), and they "get along together because he assumes the position of a child and she assumes the position of the de facto parent". Plaintiff's failure to use his hairdressing training is indicative of his general disinclination to work. A psychiatrist explained that, instead of saying, "I made a wrong choice and I don't like this," he says, "I can't lift my arms up to do it". He "finds a reason not to do it, but not the true reason".[6]

In the initial hearing, the WCAB found no causal connection, no aggravation of a pre-existing condition. Upon remand the WCAB found a causal connection to plaintiff's employment and, therefore, that plaintiff had a compensable disability. The WCAB was affirmed by the majority, but again only after completing its own findings of fact.

*Harold K. MacKenzie*

Plaintiff was born in 1909 and, after an automobile accident (he had a leg wound which would not heal), treatment for high blood pressure and hospitalization (from August 23, 1965 to September 12,

---

[6] The quoted language is taken from the testimony of Dr. Gordon R. Forrer.

1965) for gall stones, he asked for and received early retirement on September 30, 1965. During the course of his employment, he never was examined by a psychiatrist.

On January 17, 1968, plaintiff claimed a psychiatric disability caused by his employment. His job had been to place red tags on parts which were to be returned to vendors. He claimed to be upset because some tags were removed and because his partner was lazy and not doing his share of the work.

After the petition was filed, plaintiff was examined by two psychiatrists.

Dr. Fink found that plaintiff had had a neurosis for "all of his life" described as "severe psychoneurosis hypochondriacal". He was "obsessed with the [inner] workings of his own basic body". He was older than his years and "everything had to be perfect". He was going through the "usual process of psychological and physical decompensation" and a realistic impairment due to the aging process. The diagnosis of Dr. Fink was that the cause of the neurotic condition was not plaintiff's job and that "his disability is his own internal neurosis".

Mr. MacKenzie's psychiatrist, Dr. Dreyer, said that previously plaintiff had felt "no pressure at work but as the years went on and his compulsive defenses weren't quite so readily adaptable as they were before, he found that what he used to do routinely was a pressure now".

Dr. Dreyer said that plaintiff had a passive aggressive personality and probably had been neurotic since he was a teenager. It had been over three years since retirement before plaintiff had petitioned for workmen's compensation, so defense counsel asked if the insomnia, etc., could be caused by something other than the job environment. Dr.

Dreyer said that other things in the environment could be causing plaintiff's troubles. "He is not working and that is troublesome for him, he is afraid, he wants to be a man and work and he is not working; that alone will cause further symptoms". He acknowledged that to be a syndrome common to many people who have worked all their lives. However, Dr. Dreyer found Mr. MacKenzie was disabled through a work-connected personal injury.

The WCAB found no causal connection in its initial opinion. After remand and after application of the required test, it still found no causal nexus and denied compensation. The majority vacates the WCAB order, finds the "honest perception" test to be met and remands for an order consistent with that finding of fact.

## II

A valid analysis of the causal nexus between mental disability and occupational trauma requires a basic understanding of the origins of the mental disorder. Most neurotic and psychotic states do not have a single cause-in-fact and are emotional disorders with a pre-existing, extremely complex etiology originating in childhood.[7] Symp-

[7] This is true of most mental disorders. One explanation is:

"To a large degree, the causes of mental illness, the factors that eventuate in the psychically or emotionally sick personality, are presumably the familiar difficulties of human existence. The so-called abnormal is but an exaggerated or unbalanced expression of the normal. For the present, therefore, it seems most fruitful to look upon most mental disorders not as the result or expression of some 'disease' but as a mode of behavior or of living that is the logical, although socially maladjusted, outcome of the particular individual's original endowment, of the molding influence of the home, of traumatic experiences that modified personality development, of the stresses and problems springing perhaps from deep within his emotional and instinctive life, of his inability to meet these strains, of the type of self-defensive reactions habitually utilized for minimizing anxiety,

toms are usually preceded by some form of trauma, however minor.[8] The relationship between such trauma and symptoms is more chronological than causal.

Placing the focal point of analysis upon the claimant's perception of causation ignores the fundamental nature of these neuroses and of human nature. The claimant is aware of the inner conflicts and emotional weaknesses which comprise the etiology of the claimed disorder on either a conscious or a subconscious level. However, for a neurotic state to exist, such as is claimed by these plaintiffs, the person must be unable, or unwilling, to recognize and resolve these problems. The disorder is an unconscious attempt at resolution. The only possible causative factor of which the claimant is, or will allow himself to be, consciously aware is the work-related trauma. Reality is elusive. It is therefore, highly unlikely that the claimant's perception of causation will be anything but his employment.

Furthermore, any valid analysis of psychiatric

and of any bodily ailments that may impair the integrity or efficiency of his biological organism. Mental disorders should therefore be regarded as patterns of human reaction set in motion by stress. The tendency to look on those who manifest nervous or mental symptoms as being different in their organization from the so-called normal is therefore erroneous." Noyes & Kolb, *Modern Clinical Psychiatry: Psychiatry for Lawyers* (Ann Arbor: Institute of Continuing Legal Education 1961), pp 83-84. See, also, Comment, *Workmen's Compensation Awards for Psychoneurotic Reactions,* 70 Yale L J 1129, 1142-1143 (1961).

[8] Symptoms are the manifestations of the mental disorder. They represent an attempt by the neurotic personality to resolve inner problems and create psychic gain. Sometimes symptoms do not appear until one's predisposition toward the mental disorder is "triggered" by some form of trauma, hence the appellation "triggered neurosis". Sometimes the neurosis has been full blown or "triggered" before employment from which compensation is sought. "Trauma" encompasses both physical and psychological impact. Although trauma traditionally includes physical impact only, emotional shock, fright or extraordinary stress may be equally traumatic.

disability cannot disregard the secondary gain to the claimant, incurred as a result of attributing causation to employment. The term "gain" is used in its psychiatric sense—psychic rather than monetary gain. However, financial compensation can produce psychic gain. Psychiatry recognizes two types of gain, both of which accrue to the individual out of unconscious motivation. Primary gains are produced by primary symptoms acting upon the mind. These symptoms (repression, withdrawal, obsession, etc.) ensure a more secure internal (mental) environment for the person. Secondary gains relate to the external environment. Secondary symptons (e.g., depression, anxiety, impatience, fatigue, pain) act upon the outside world (e.g., home, job, friends) to produce a secure external environment. See 3 Lawyers' Medical Cyclopedia (rev vol), §§ 20.6–20.7.[9] In the case of a person who dislikes his work or whose aging process renders him psychologically unable to do even simple tasks, secondary gains might be not having to work, removal of fiscal responsibility, financial compensation and a socially acceptable excuse for not working.

A person afflicted with a mental disorder will, almost as a matter of course, claim precipitating trauma as a more palatable explanation of his or her symptoms. Responsibility for the inability to resolve mental and emotional conflicts may be shifted quite unconsciously to the employment. It makes for satisfactory results—a socially acceptable disability, freedom from responsibility, financial compensation, sympathy and understanding—and creates a secure external environment. The

[9] See, also, Usdin, *Neurosis Following Trauma,* in Law, Medicine, Science—and Justice (Bear, ed, Springfield, Ill: Charles C Thomas, 1964), pp 237-239; Blinder, *The Defense of Claims of Psychic Trauma and Psychiatric Disability,* 12 Forum 934, 937 (1977).

inability consciously to accept the fact that he or she is neurotic leads to the claimant's search for a more psychically pleasing excuse for his problems. Or, as one commentator posits:

"Psychiatric claims seem only to arise when there is someone *other* than the claimant at fault or at least able to assume financial responsibility for the effects of injury. By contrast, the number of claims of psychiatric disability following trauma consequent to an athletic injury or to the plaintiff's drunkenly driving his own car into a tree are infinitesimally small.

\* \* \*

"What indeed may be occupationally related, however, is the neurotic secondary gain—the unconscious 'fringe benefits' often consequent to disability—always a factor in claims of psychiatric disability. Though not causative (in that secondary gain arises as an issue *following* injury), such secondary gain factors as financial compensation, the solicitude of others, freedom from responsibility and/or restitution for real or imagined past exploitation may greatly prolong convalescence and prevent recovery." Blinder, *The Defense of Claims of Psychic Trauma and Psychiatric Disability,* 12 Forum 934, 937 (1977).

Suppression of inner conflicts from consciousness, secondary gain and basic human nature dictate that a neurotic personality attribute symptoms to the last event in the chronological progression of his or her etiology. Trauma associated with employment is usually that last event, or it is the only etiological factor which the claimant will recognize. As one writer notes:

"Even when the extra straw causes a fracture, note should be made that there are many instances on record wherein the complainant, *in all sincerity,* attributed his symptoms to the straw, not realizing that certain coincidental factors were more relevantly re-

lated to the appearance of his symptoms. *It is all too
human for a person to attribute his anxieties and pains
to external causes rather than to his own internal
problems.*" (Emphasis added.) Yochelson, *Traumatic
Neurosis,* Readings in Law and Psychiatry (Allen, Fer-
ster, Rubin, eds, Baltimore: The Johns Hopkins Univer-
sity Press, 1975), p 453.

The job becomes a convenient "hook" upon
which to hang all one's troubles. The psychiatric
testimony in each of the cases before us supports
this analysis. Deziel, Bahu and MacKenzie attrib-
uted all of their problems to work-related trauma.
It was completely predictable that they would do
so. Similarly, the suggestive effect of the legal
emphasis upon the causative role of the job, neces-
sary to recovery, will not often be lost on the
worker who hangs his life's problems on the
"hook" of some trivial stimulus or trauma. Indeed,
it is the common conclusion of psychiatrists that
the compensation process promotes neuroses and
has a debilitating effect upon claimants.[10]

Not only is a neurotic personality predisposed
toward mental disorder prior to the perceived
symptom-precipitating trauma, but such a person-

[10] See, *e.g.,* Miller & Fellner, *Compensable Injuries and Accompany-
ing Neurosis: The Problem of Continuing Incapacity Despite Medical
Recovery,* 1968 Wis L Rev 184; Usdin, fn 9, *supra;* Hanna, *Neurosis in
Workmen's Compensation Cases,* 11 Defense L J 189 (1962). Indeed,
one article notes:

"An able neuro-psychiatrist of our acquaintance went so far as to
say it would be a signal service if courts could be induced to deny
compensation in *all* cases of traumatic neurosis, as this would do
more than any medical means to banish the disorder. We would not
go so far as to espouse universal denial of compensation, but certainly
this viewpoint has much in its favor in regard to *neuroses which
appear following trivial stimuli.*" (Emphasis added.) Smith & Solomon,
*Traumatic Neuroses in Court,* 30 Va L Rev 87, 107 fn 26 (1943).

The related problem of "compensation neurosis" is further indica-
tion of the often counter-productive nature of the compensation
process, at least with regard to mental disorders. *E.g.,* 1A Larson,
Workmen's Compensation Law, § 42.24.

ality is *predisposed* to "honestly perceive some personal injury incurred during the ordinary work of his employment 'caused' his disability". Acceptance of this fact makes it clear that the majority's "honest perception" standard is of little utility as an honest analytical tool.

A further objection to my colleagues' test is its broad grasp. Clearly, a claimant may have a real mental injury and not be entitled to workers' compensation because of a lack of nexus. This situation becomes particularly apparent when the mental disorder is extant prior to occupational trauma or prior to commencement of employment, as in *Deziel.*[11] However, my brothers' standard would provide compensation even in this situation. Such a result is beyond the ambit and purposes of workers' disability legislation.

### III

At this juncture, reflection upon the concern for the problem of simulation or malingering is in order. The aforementioned discussion of the neurotic claimant's predisposition to perceive his occupation as the sole cause of his symptoms is not predicated upon viewing the claimant as a malingerer. The same conclusion follows if one *assumes* that the claimant is being totally honest. Neurotic and psychotic personalities are predisposed to honestly perceive that some psychically satisfying trauma caused their disability.

---

[11] See fn 4-5 and accompanying text *supra.* An even more revealing fact situation is provided by *Redfern v Sparks-Withington Co,* 403 Mich 63; 268 NW2d 28 (1978), also released today. Joseph Pastaleniec, making a claim for incurable insanity, was described by *his* expert witness as an obsessive-compulsive who was depressed and intermittently psychotic *before* his occupational "accident". The trivial accident was said to be an excuse for him not to work. Yet the record reflects that the claimant "honestly perceives" that his disability was work-related.

While we agree that mental injuries are no less genuine than physical injuries, the line between conscious and unconscious simulation is fine. For instance, simulation can start as a conscious and comfortable effort to free one's conscience or to appear in a better light to specific persons or the populace in general. It eventually can become a reality to the simulator. We suspect that such "honest perception" is not peculiar only to neurotics and psychotics. It is a not uncommon defense mechanism for many. Whether it is consciously or unconsciously willed, it is a diagnostic factor to be recognized and psychiatrists disagree as to the ability of the profession to detect the difference.[12]

However, we fail to see how the diagnostic techniques used to detect simulation can aid in determining whether a claimant's self-serving statement of perception is "honest". Our colleagues' discussion of malingering relates to whether the person is truly disabled—but their "subjective", "honest perception" standard relates only to causal nexus.

No concern has been shown for the problem of weighing the credibility of a mentally disturbed

---

[12] Usdin, in *Neurosis Following Trauma, supra,* fn 9, pp 242-244, says:

"It is a difficult task in a personal injury case [or compensation case] to differentiate malingering from psychoneurosis. Actually, malingering and hysteria may be considered to differ from each other only in the degree in which the conscious mind is a participant. Malingerers consciously fabricate while neurotics unconsciously use feigned illness to satisfy neurotic needs. *Some may disagree, but the author does not believe that psychiatry has developed to the point that psychiatrists can, all the time, or even nearly all the time, detect malingerers,* * * * . The diagnosis of malingering can be made in some cases only after a confession of malingering by the patient." (Emphasis added.)

There are, however, others who believe malingering can be detected by a competent psychiatrist, excepting the extremely experienced or well-trained simulator. See, *e.g.,* Keschner, *Simulation of Nervous and Mental Disease,* 44 Mich L Rev 715 (1946).

person. Indeed, it is unlikely that a referee or the WCAB can ascertain with any degree of certainty whether a neurotic person (to say nothing 'of a psychotic) is telling the truth. By adoption of the "honest perception" standard for determining an employer's responsibility, we only invite confusion, difficulty for the finder of fact and increased arbitrariness.

## CONCLUSION

Finding the "honest perception" or "imaginary" standard untenable necessitates formulation of an acceptable means for determining causal nexus. Our efforts are constrained by the legislative requirement that an award of compensation be factually supported by some medical evidence connecting the injury and the employment.[13] It is this factual predicate which the majority's standard disregards.

The question in these appeals is whether the injury "arose out of" the occupation. Given that mental disorders have many elements comprising

[13] Although the occupation need not be the proximate cause of the injuries, *Whetro v Awkerman*, 383 Mich 235; 174 NW2d 783 (1970), *Vanderbee v Knape & Vogt Manufacturing Co*, 48 Mich App 488; 210 NW2d 801 (1973), it is clear that the statute minimally requires some medical evidence causally connecting the injury and the occupation. MCL 418.301; MSA 17.237(301). We adhere to the previous position, in dissent, that the analytical knife need not be honed sharper than the statutory language. *Deziel v Difco Laboratories, Inc*, 394 Mich 466; 232 NW2d 146 (1975) (COLEMAN, J., dissenting). However, if we are to provide further guidance to the finder of fact, we must still be cognizant of the minimal nexus requirements set by the Legislature.

My colleagues would remove even this weak factual link between injury and occupation and replace it with a standard which requires no factual basis for awarding compensation. The implicit, if not explicit, justification for "repealing" the Legislature's factual prerequisite is the assumption that modern medicine lacks the expertise to determine nexus with any degree of certainty and consistency. Although psychiatry is not an exact science, it is still the best source of expertise available to the finder of fact.

their etiology, we find Professor Larson's formulation of the factual issue more probative than the "honest perception" approach. The relevant inquiry is whether claimant's employment did, in fact, "aggravate, accelerate or combine with some internal weakness or disease to produce the disability".[14] 1 Larson, Workmen's Compensation Law, § 12.20.

We would add the caveat that the fact finder will have to find more than a "de minimis" relationship between the mental disorder and the occupation before awarding compensation. In other words, in light of the acknowledged relationship between symptoms and non-occupational events, the causal connection must be established in some substantial degree.[15] It is not enough to say that if a plaintiff thinks he is totally disabled by his employment, he is—regardless of whether the disability occurred before employment or was caused by the natural process of aging or disinclination to work.

There is no doubt that the decision today will be a costly burden to Michigan employers, small and large, who compete with out-of-state business and to the consumers who absorb those costs. The concern here expressed, however, is not only for employers and consumers but for employees. We have engaged in a seemingly inexorable march towards limiting the hiring of workers to only

[14] The majority rejects this query as too "objective" in nature. We cannot agree with this characterization. If one focuses upon the individual, as distinct from the "average" employee, the "aggravate-accelerate-combine" language is inherently subjective.

[15] This is particularly true because the statute provides compensation for the full extent of the injury. For an argument that awarding compensation in proportion to the extent of the causative role of the job is possible and proper in workmen's compensation, see Smith & Solomon, *Traumatic Neuroses in Court,* 30 Va L Rev 87, 138-148 (1943). See, also, 2 Larson, Workmen's Compensation Law, § 59.20.

those persons in the top echelon of physical and mental condition.

While workmen's compensation costs are burgeoning, the benefits must be spread ever more thinly among the workers to accommodate new categories of disorders (and ever more remote accidents) which cannot be guarded against or controlled by an employer. Moreover, when businesses close or move to another state, jobs and tax revenues are lost. When expansions of existing businesses are taken to other states, Michigan residents lose opportunities for employment. These economic facts of life should not be overlooked when we expand legislation by judicial fiat.

We do no service to the people of Michigan with this open-door opinion, especially when the new majority standard is considered in tandem with *Anna Redfern* and the other so-called "incurable insanity or imbecility" cases also released today.[16]

The WCAB found a causal nexus between employment and injury in *Bahu* and reached the opposite result in *MacKenzie* and *Deziel*. We would not disturb these findings of fact which were made upon directions from this Court on remand.

We would affirm.

FITZGERALD and RYAN, JJ., concurred with COLEMAN, J.

---

[16] *Redfern v Sparks-Withington Co,* 403 Mich 63; 268 NW2d 28 (1978).